UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

JEANNETTE SANTIAGO,

        Plaintiff,

    -against-

COMMISSIONER OF SOCIAL SECURITY

        Defendant.

**MEMORANDUM OF DECISION AND ORDER**
16-CV-05006 (LDH)

-------------------------------------------------------------------x
LaSHANN DeARCY HALL, United States District Judge:

    Plaintiff Jeannette Santiago, proceeding pro se, appeals the decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for benefits under the Social Security Act (the "Act"). Defendant moves pursuant to Federal Rule of Civil Procedure 12(c) for judgment on the pleadings, requesting that this Court affirm the Commissioner's determination and dismiss the instant action.

## BACKGROUND

    On July 20, 2012, Plaintiff, a former assistant teacher, filed an application for disability insurance benefits, alleging disability commencing on June 18, 2012. (Tr. 16, 39, 168–75.)[1] Specifically, Plaintiff alleged that she was disabled due to arthritis in both of her knees, additional knee pain, neck pain, and back pain. (*Id.* at 187.) On December 11, 2012, the Social Security Administration (the "SSA") denied Plaintiff's application finding that Plaintiff's condition was not sufficiently severe to prevent her from performing as an assistant teacher. (*Id.* at 97–100.) On December 18, 2012, Plaintiff requested a hearing before an administrative law

---

[1] Citations to "Tr." refer to the certified copy of the administrative record of proceedings filed by the Commissioner as part of her answer. (ECF No. 7.)

1

judge ("ALJ"). (*Id*. at 95–96.) Prior to her hearing, upon an informal remand to the SSA, it was again determined that Plaintiff's claim should be denied. (*Id*. at 90, 307.) On October 10, 2013, Plaintiff, accompanied by counsel, appeared before ALJ Jay L. Cohen. (*Id*. at 34–52.) After reviewing the record and holding a supplemental hearing, the ALJ issued a decision denying Plaintiff's request for benefits on October 28, 2014. (*Id*. at 13–33, 53–88.) Subsequently, the Appeals Council granted Plaintiff's request for review in order to correct the ALJ's failure to use the appropriate medical vocational rule at step five of the sequential evaluation. (*Id*. at 164–67.) Nevertheless, the correction did not alter the ultimate determination. On July 8, 2016, the Appeals Council issued a final decision finding that Plaintiff was not disabled from the alleged onset date to the date of the ALJ's decision. (*Id*. at 1–9.)

**I. Treating Physician Medical Evidence**

Over the course of approximately four years, Plaintiff saw five treating physicians for general ailments and injuries that she sustained in two motor vehicle accidents. The initial motor vehicle accident occurred on June 7, 2009. (*Id*. at 315–16.) Plaintiff was treated for injuries to her left knee and spine. (*Id*.) Less than two years later, on February 1, 2011, Plaintiff was involved in a second motor vehicle accident. (*Id*. at 235–36.) Plaintiff reinjured her left knee and spine as well as sustained an injury to her left wrist. (*Id*.)

    A. <u>Evidence Prior to Plaintiff's Alleged Onset Date of June 18, 2012</u>

Immediately following the June 7, 2009 motor vehicle accident, Plaintiff was placed under the care of Dr. Heyligers.[2] (*Id*. at 315–16.) Dr. Heyligers started Plaintiff on physical

---

[2] Dr. Heyliger's notes were not included in the administrative record. However, after Dr. Heyliger referred Plaintiff to Dr. Kevin E. Wright, Dr. Wright considered and referenced Dr. Heyliger's notes in his initial consultation with Plaintiff. (Tr. 315–16.)

therapy, chiropractic treatments, and acupuncture. (*Id.* at 315.) He then referred Plaintiff to another treating physician, Kevin E. Wright, M.D. (*Id.*)

Dr. Wright, an orthopedic surgeon, saw Plaintiff for an initial consultation on September 1, 2009. (*Id.*) At the time, Plaintiff complained of left knee pain. (*Id.*) An MRI of the left knee revealed that there was an intrasubstance tear of the posterior horn of the medial meniscus, a partial tear of the anterior cruciate ligament, and joint effusion. (*Id.* at 316.) Because conservative treatment failed, Dr. Wright performed left knee arthroscopic surgery on September 23, 2009. (*Id.* at 316, 356–58.)

Two weeks after surgery, Plaintiff's knee pain improved, but she began to complain of left wrist pain. (*Id.* at 317.) Dr. Wright ordered an MRI that revealed a partial tear of the triangular fibrocartilage, a partial tear of the extensor carpi ulnaris tendon, and joint effusion. (*Id.* at 317, 355.) Dr. Wright performed left wrist arthroscopic surgery on November 18, 2009, to address the issues identified in the MRI. (*Id.* at 359–60.)

Over the course of two years, during follow-up visits, Plaintiff complained of persistent left knee pain that was exacerbated by activity, left wrist pain, and muscle cramping. (*Id.* at 320–34.) To address her ailments, Dr. Wright prescribed various pain medications, physical therapy, knee injections, a knee brace, a cane, a Jones dressing, and compression stockings. (*Id.*) On January 28, 2011, Dr. Wright wrote a medical note excusing Plaintiff from work due to the significant swelling and pain of her knee. (*Id.* at 334.)

Plaintiff continued to see Dr. Wright following the February 2011 accident. (*Id.* at 235–36, 335–51.) In addition to her prior ailments, she began to complain of right knee pain, numbness and paresthesias in the distribution of the median nerve of the left hand, as well as cervical spine pain that radiated down her left upper extremity. (*Id.* at 335–43.) Upon

examination, Dr. Wright prescribed pain medication and referred Plaintiff to a pain management doctor. (*Id.*) Dr. Wright also referred her for an MRI of her lumbosacral spine. (*Id.* at 363–64.)

An April 22, 2011 MRI of the lumbosacral spine revealed a posterior disc herniation at L4-L5, with impingement of the left L5 nerve root within the lateral recess. (*Id.*) In addition, a few days later, Plaintiff complained of persistent low back pain that radiated down her left lower extremity. (*Id.* at 362.) In response, Dr. Wright referred Plaintiff to another treating physician, Paul M. Brisson M.D., for evaluation and treatment of her spinal pathology. (*Id.*)

Dr. Brisson, an orthopedic spinal surgeon, held an initial consultation with Plaintiff on May 2, 2011. (*Id.* at 235–36.) Dr. Brisson reviewed an April 28, 2011 MRI and noted that Plaintiff had documented disc herniation. (*Id.*) When medication and a rehabilitative exercise program did not provide relief, Dr. Brisson performed a L4-L5 microdiskectomy and lumbar laminectomy on June 21, 2011. (*Id.* at 240–42.) Though Plaintiff initially did well following the surgery, on August 1, 2011, she informed Dr. Brisson that her persistent cervical pain had been constant since her February 2011 accident. (*Id.* at 246–47.) During the consult, Dr. Brisson reviewed a June 10, 2011 cervical spine MRI which showed posterior disc herniation at C5-C6, with disc space narrowing and desiccation of the disc. (*Id.*) Dr. Brisson then planned for cervical spinal surgery. (*Id.*)

In May 2011, Plaintiff reported that her left knee pain was improving. (*Id.* at 341.) However, in October 2011, she complained of left upper extremity pain that radiated from her cervical spine. (*Id.* at 342–43.) On January 13, 2012, Plaintiff complained of bilateral knee pain, worse on the right than the left. (*Id.* at 344–45.) An MRI of the right knee on June 11, 2012, revealed a complex tear of the anterior root of the medial meniscus with an eight millimeter perimeniscal cyst, severe chondromalacia patellae, lateral femoral condyle patellar tendon

friction syndrome, minimal effusion, Small Baker's cyst, posterior medial tibial metadiaphyseal ganglion cyst, and mild deep infrapatellar bursitis. (*Id.* at 350, 429–30.) Plaintiff elected to move forward with surgery to address the issues identified in the MRI. (*Id.* at 350.)

> B. <u>Evidence On or After Plaintiff's Alleged Onset Date of June 18, 2012</u>

Plaintiff saw four treating physicians after the alleged onset date. She continued to see her first two treating physicians—Drs. Wright and Brisson—and, she saw two additional physicians.

> *1. Paul M. Brisson M.D.*

Dr. Brisson performed the C5-C6 cervical discectomy fusion on June 22, 2012. (*Id.* at 251–52.) Following the surgery, Dr. Brisson noted that Plaintiff was doing well in terms of rehabilitation, but still complained of neck pain and right arm weakness. (*Id.* at 377–79.) During an August 1, 2012 follow-up visit, Dr. Brisson advised in a medical note that Plaintiff was still limited in function, and that it was not advisable for Plaintiff to lift, bend, or engage in any type of strenuous activities while at work. (*Id.* at 379.)

On October 24, 2012, Plaintiff had another follow-up visit with Dr. Brisson. (*Id.* at 380.) Plaintiff reported residual neck pain radiating into her right upper extremity, as well as low back pain radiating to her left lower extremity. (*Id.*) In response, Dr. Brisson directed Plaintiff to take medication as needed and to follow-up with rehabilitation and physical therapy. (*Id.*)

> *2. Kevin E. Wright, M.D.*

On August 13, 2012, Dr. Wright performed right knee arthroscopic surgery. (*Id.* at 353–54.) In a follow-up visit on August 24, 2012, Plaintiff reported that her right knee felt significantly better. (*Id.* at 348.) Dr. Wright prescribed pain medication and physical therapy to help with the recovery process. (*Id.*)

On December 18, 2012, Plaintiff saw Dr. Wright and complained of knee pain and persistent knee buckling. (*Id.* at 349.) Dr. Wright encouraged Plaintiff to start physical therapy and prescribed additional pain medication. (*Id.*) Plaintiff reported some improvement from the physical therapy and pain medication the following month; however, she also reported a trip and fall. (*Id.* at 351.) Dr. Wright prescribed a cane for Plaintiff, to prevent additional falls. (*Id.*)

### 3. *Daniel P. Klein, M.D.*

Daniel P. Klein, M.D., saw Plaintiff monthly from June 8, 2012 to October 2, 2012. (*Id.* at 276–80.) In an undated medical report, Dr. Klein concluded that Plaintiff had lumbar disc disorder, cervical disc disorder, and Vitamin B12 deficiency. (*Id.* at 276.) For treatment, he prescribed pain medication. (*Id.* at 277.) Dr. Klein's opinion was that Plaintiff suffered from no limitations in terms of lifting and carrying, standing and/or walking, sitting, pushing and/or pulling, or any other limitations with respect to Plaintiff's ability to do work-related physical activities. (*Id.* at 279–80.)

### 4. *Richard Seldes, M.D.*

Plaintiff began to see Richard Seldes, M.D., on August 14, 2013, complaining of pain in her lower back and both knees. (*Id.* at 453–55.) X-rays of the right knee showed a shift of the right patella and mild arthritis. (*Id.* at 455.) X-rays of the lower back revealed narrowing of the L3-L4 spaces. (*Id.*) Dr. Seldes diagnosed pain in Plaintiff's left knee and ruled out a tear of the right knee as well as a herniated disc in the lumbar spine. (*Id.*) An MRI of the lumbar spine taken on August 20, 2013, revealed post interval left L4-L5 hemliaminotomy and probable L4-L5 discectomy, mild L3-L4 disc bulge, and mild L2-L3 disc bulge with a new small distal right foraminal/extra foraminal annulus tear. (*Id.* at 447–48.)

Plaintiff returned to Dr. Seldes on September 16, 2013, reporting that she had fallen a week earlier when her right knee locked. (*Id.* at 443–44.) Plaintiff stated that the fall hurt her

right ankle and back. (*Id.* at 443.) An MRI of the right knee revealed a complex tear of the medial meniscus with articular cartilage injury of the patellofemoral joint. (*Id.*) An MRI of the lumbar spine showed disc herniation and bulging at L4-L5 and L5-S1. (*Id.*) Dr. Seldes recommended right knee arthroscopy and a right ankle MRI scan. (*Id.* at 444.) The MRI of the right ankle revealed a bone contusion and microfracture of the anterolateral talus. (*Id.* at 445.) In response to the MRI results, Dr. Seldes prescribed a CAM walker boot and crutches. (*Id.*) Upon follow-up, Plaintiff reported worsening right knee pain. (*Id.* at 446.) Dr. Seldes again recommended arthroscopic surgery, which had been postponed due to Plaintiff's ankle injury. (*Id.* at 445–46.)

On October 29, 2013, Dr. Seldes performed an arthroscopy of the right knee. (*Id.* at 480–82.) At a subsequent visit, on November 7, 2013, Plaintiff reported mild-to-moderate right knee pain. (*Id.* at 470.) Plaintiff then slipped on ice and re-injured her right knee. (*Id.* at 468.) Plaintiff went to the emergency room after falling, but she reported that the x-rays were negative. (*Id.*)

Plaintiff continued to complain of bilateral knee pain at her January 9, 2014 appointment. (*Id.* at 466.) She also complained of right hip pain, and claimed that the pain made it difficult for her to walk and stand for prolonged periods of time. (*Id.*) Plaintiff reported worsening pain in her left knee; and, an examination revealed that both knees had patellofemoral crepitus as well as pain along joint lines. (*Id.*) Dr. Seldes' review of a left knee MRI revealed arthritic changes and patellofemoral arthritis. (*Id.*) In response to the complaints of pain, Dr. Seldes administered an injection in Plaintiff's left knee and recommended an MRI scan of her hip. (*Id.* at 466–67.)

Upon follow-up, on April 10, 2014, Plaintiff reported persistent pain in her right knee and right hip. (*Id.* at 478.) Dr. Seldes then administered another injection, but this time in Plaintiff's right knee. (*Id.*) In his progress notes, Dr. Seldes wrote that Plaintiff "was still unable to return to work." (*Id.*) On May 8, 2014, Plaintiff reported persistent pain in both knees and in her right hip. (*Id.* at 483.) Examination revealed that both of Plaintiff's knees had positive patellar grind tests. (*Id.*) In light of Plaintiff's persistent right hip pain, swelling, and stiffness, Dr. Seldes recommended an MRI to rule out a tear. (*Id.*)

**II. Consultative Examiner Medical Evidence**

Three consultative examiners provided assessments of Plaintiff's physical limitations.

A.  <u>Chaim Shtock, D.O.</u>

On October 11, 2012, Dr. Chaim Shtock conducted his first and only examination of Plaintiff. (*Id.* 270–73.) Following his examination, he opined that while Plaintiff complained of significant neck and lower back pain, she was only moderately limited for most activities. (*Id.*) Specifically, he reported that she was moderately limited in squatting, kneeling, crouching, frequent stair climbing, walking long distance, standing long periods, and sitting long periods. (*Id.* at 273.) Further, Plaintiff had a moderate to marked limitation with respect to heavy lifting and bending, and she was able to perform some activities, such as overhead activities requiring both arms or manual activities that required her hands, without limitation. (*Id.*)

B.  <u>John Shane, M.D.</u>

On March 15, 2013, after review of Dr. Shtock's opinion,[3] Dr. John Shane completed a physical residual functional capacity ("RFC") assessment. (*Id.* at 300–06.) Dr. Shane opined that Plaintiff could: (1) frequently lift and/or carry ten pounds; (2) stand and/or walk for at least

---

[3] Dr. Shane cited only Dr. Shtock's opinion as the basis for his conclusions. (Tr. 301.)

8

two hours in an eight-hour workday; (3) sit for about six hours in an eight-hour workday; (4) occasionally operate hand or foot controls, which required pushing and pulling; (5) occasionally climb ramps or stairs; and (6) occasionally balance, stoop, kneel, crouch, and crawl. (*Id.*) However, in Dr. Shane's opinion, Plaintiff should never climb ladders, ropes, and scaffolds. (*Id.* at 303.)

      C.     <u>Louis A. Fuchs, M.D.</u>

On March 12, 2014, upon a review of Plaintiff's medical files, Dr. Louis Fuchs, an orthopedic surgeon, assessed Plaintiff's ability to do physical work-related activities. (*Id.* at 456–64.) Dr. Fuchs opined that Plaintiff could lift and carry up to twenty pounds continuously, but that she could never lift or carry more than twenty pounds. (*Id.* at 456.) Further, in his estimation Plaintiff could: (1) sit, stand, or walk for one hour without interruption; (2) sit for an entire eight-hour workday; and (3) stand or walk for two hours in an eight-hour workday. (*Id.* at 457.) With respect to Plaintiff's ability to use her hands and feet, Dr. Fuchs noted only a slight limitation with Plaintiff's ability to reach overhead and operate foot controls. (*Id.* at 458.) With respect to postural activities, Dr. Fuchs opined that Plaintiff should never climb ladders, climb scaffolds, or crawl, but that she could occasionally climb stairs and ramps, balance, stoop, kneel, and crouch. (*Id.* at 459.) Lastly, when assessing the length of time that Plaintiff could tolerate exposure to certain conditions, Dr. Fuchs estimated that Plaintiff could: (1) never be exposed to humidity and wetness, extreme cold, or vibrations; (2) occasionally be exposed to unprotected heights and extreme heat; (3) frequently operate a motor vehicle; and (4) continuously be exposed to moving mechanical parts. (*Id.* at 460.)

At Plaintiff's administrative hearing, Dr. Fuchs testified that he cited only to Dr. Shtock's one-time examination as the basis for his opinion that Plaintiff did not suffer more than a

9

minimal limitation in terms of performing activities of daily life and work. (*Id.* at 57, 68.) Dr. Fuchs also testified that Dr. Shtock found Plaintiff to have more severe restrictions. (*Id.* at 72.) Ultimately, Dr. Fuchs opined that though Plaintiff had some severe impairments, such as degenerative osteoarthritis, none of them met or equaled a listing. (*Id.* at 57, 67.) In his estimation, Plaintiff's impairments would make it difficult for her to kneel and crouch repetitively, walk for prolonged distances, and squat. (*Id.* at 57, 59.) Further, he stated that Plaintiff might have some minimal limitations due to a right ankle fracture. (*Id.* at 59.) Lastly, Dr. Fuchs explained his use of a question mark on page two of the assessment. The question mark indicated that he was unsure whether Plaintiff could even stand or walk for one uninterrupted hour; Plaintiff may be able to perform either activity for only thirty minutes. (*Id.* at 69, 73.)

### III. Vocational Expert Testimony

On September 18, 2014, Andrew Vaughn, a vocational expert, testified about Plaintiff's ability to work, taking into account her age, education, work experience, and limitations. (*Id.* at 74–87.) After the ALJ gave Mr. Vaughn a hypothetical, which used Dr. Fuchs' findings as inputs, Mr. Vaughn testified that Plaintiff could no longer perform as a teaching assistant, but that she could perform several sedentary jobs such as a reservation clerk, a check-cashing cashier, and a receptionist. (*Id.* at 77–82.) However, when Plaintiff's attorney proposed a hypothetical inspired by Dr. Shane's examination where Plaintiff could sit, stand, and walk for only two hours each in an eight-hour workday, Mr. Vaughn indicated that she would not be able to locate full-time competitive employment. (*Id.* at 84–85.)

## IV. Plaintiff's Function Report and Testimony

A function report was prepared for Plaintiff on September 4, 2012. (*Id.* at 195–205.) According to Plaintiff's report, her frequent pains manifest in the form of aches, tightness, numbness, and weakness. (*Id.* at 203–04.) Sometimes, if she sits too long, a pain will radiate throughout her body. (*Id.* at 204.) To alleviate the pain, Plaintiff takes pain medication. (*Id.*) As a result of the pain, Plaintiff reported that she was no longer able to perform activities such as walking up and down stairs, pulling, lifting, and carrying groceries. (*Id.* at 196, 204.) Further, Plaintiff's pain and injuries affect her ability to care for her hair, feed herself, use the toilet, and sometimes sleep. (*Id.* at 196–97.) Plaintiff also noted that at times she needs help mopping and sweeping. (*Id.* at 198.)

At the October 10, 2013 administrative hearing, Plaintiff testified that her pain has prevented her from working full time since 2012. (*Id.* at 38–52.) Plaintiff initially stopped working in 2012 because she had a pending back surgery scheduled with Dr. Brisson. (*Id.* at 50.) She attributed her ongoing inability to work as an assistant teacher to "other problems" preventing her from performing her daily duties and climbing the five floors of stairs at her job. (*Id.* at 40.) On an average day, Plaintiff stated that she could walk up to two blocks, sit for thirty minutes, stand for fifteen to twenty minutes, and lift up to five pounds. (*Id.* at 40–41.) She testified that she was unable to sit for too long with her grandson in the park before her legs went numb. (*Id.* at 46–49.) As such, her visits to the park lasted approximately twenty-five minutes. (*Id.* at 49.) Plaintiff further testified that she could write only for a short period because she quickly lost strength in her hands. (*Id.* at 43.) Additionally, Plaintiff testified that she could no longer drive a vehicle or walk to the subway, which was eleven blocks away. (*Id.* at 46–48.)

However, she was able to go to the grocery store, cook small meals for herself, clean as long as bending was not required, browse on a computer, and ride the bus. (*Id.* at 46–49.)

V. **ALJ's Decision**

In finding that Plaintiff was not disabled, the ALJ followed the sequential five-step process that governs claims for disability insurance benefits. *See* 20 C.F.R. § 404.1520(a)–(h). *First*, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 18, 2012, the alleged onset date. (Tr. 18.) *Second*, the ALJ determined that Plaintiff had the following severe impairments: right knee status post arthroscopic surgery requiring subsequent surgery, left knee surgery status post arthroscopic surgery, right ankle microfracture anterior inferior talus, lumbar disc herniation and bulge impinging nerve root status post microdiscectomy, status post cervical discectomy and fusion, and internal derangement left wrist repaired arthroscopically. (*Id.*) *Third*, the ALJ found that Plaintiff's physical impairments did not meet or equal the severity of the impairments in the listings. (*Id.* at 19.) *Fourth*, the ALJ determined that, in light of Plaintiff's impairments, she had a RFC to perform less than the full range of "sedentary work," as defined in 20 C.F.R. § 404.1567(a). (*Id.*) *Fifth*, the ALJ determined that Plaintiff could perform the following jobs: reservations clerk, check cashing cashier, and receptionist. (*Id.* at 29.)

## STANDARD OF REVIEW

A motion for judgment on the pleadings is reviewed under the same standard as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010) ("The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings."). Further, when a plaintiff proceeds pro se, the court will read her submissions

liberally and "interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (citing *Mikinberg v. Baltic S.S. Co.*, 988 F.2d 327, 330 (2d Cir. 1993)).

Under the Act, a disability claimant may seek judicial review of the Commissioner's decision to deny her application for benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Felder v. Astrue*, No. 10-CV-5747, 2012 WL 3993594, at *8 (E.D.N.Y. Sept. 11, 2012). In conducting such review, the Court is tasked only with determining whether the Commissioner's decision is based on correct legal standards and supported by substantial evidence. 42 U.S.C. § 405(g); *see also Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)).

The substantial evidence standard does not require that the Commissioner's decision be supported by a preponderance of the evidence. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982) ("[A] factual issue in a benefits proceeding need not be resolved in accordance with the preponderance of the evidence . . . ."). Instead, the Commissioner's decision need only be supported by "more than a mere scintilla" of evidence and by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pollard v. Halter*, 377 F.3d 183, 188 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must examine the entire record and consider all evidence that could either support or contradict the Commissioner's determination. *See Jones ex. rel. T.J. v. Astrue*, No. 07-CV-4886, 2010 WL 1049283, at *4 (E.D.N.Y. Mar. 17, 2010) (citing *Snell v. Apfel*, 171 F.3d 128, 132 (2d Cir. 1999)), *aff'd sub nom. Jones ex rel. Jones v. Comm'r of Soc. Sec.*, 432 F. App'x 23 (2d Cir. 2011). Still, the Court must defer to the Commissioner's conclusions regarding the weight of

conflicting evidence. *See Cage v. Comm'r of Social Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (citing *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998)). If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed. *Ortiz v. Comm'r of Soc. Sec.*, No. 15-CV-3966, 2016 WL 3264162, at *3 (E.D.N.Y. June 14, 2016) (citing 42 U.S.C. § 405(g)). Indeed, if supported by substantial evidence, the Commissioner's findings must be sustained, even if substantial evidence could support a contrary conclusion or where the Court's independent analysis might differ from the Commissioner's. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982)); *Anderson v. Sullivan*, 725 F. Supp. 704, 706 (W.D.N.Y. 1989); *Spena v. Heckler*, 587 F. Supp. 1279, 1282 (S.D.N.Y. 1984)).

The Code of Federal Regulations for Social Security (the "Regulations") establishes a sequential five-step process for determining whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520(a)–(h). At the first step, the Commissioner must determine whether the claimant is engaged in substantial gainful activity. *Id.* § 404.1520(b). If not, the Commissioner must proceed to the second step to determine whether the claimant has a severe medically determinable impairment or combination of impairments. *Id.* § 404.1520(c). An impairment is severe if it significantly limits a claimant's abilities to perform "basic work activities." *Id.* If the claimant has a medically determinable severe impairment, the Commissioner will proceed to step three to determine whether any identified severe impairments meet or medically equal those identified in Appendix 1 to the Act. *Id.* § 404.1520(d). Such impairments are per se disabling if a claimant meets the duration requirements. *Id.*

If a claimant's impairments are not per se disabling, the ALJ must assess the claimant's ability to work in light of her limitations, otherwise known as her RFC. *Id.*

§§ 404.1520(a)(4)(iv), 404.1520(e), 404.1545(a)(1). Once the claimant's RFC is decided, the Commissioner must undertake to establish whether the claimant's RFC will allow her to perform past relevant work. *Id.* § 404.1520(f). If the claimant's RFC precludes her from performing past relevant work, the Commissioner bears the burden of proving that, given her RFC, age, education, and work experience, the claimant can do other work that exists in significant numbers in the national economy. *Id.* § 404.1520(g)(1). If such work exists, the claimant is not disabled. *Id.*

**DISCUSSION**

Defendant maintains that the ALJ properly determined that Plaintiff was not disabled. (Def.'s Mem. Supp. J. Pleadings at 1, ECF No. 16.) The ALJ's decision was premised largely on the opinion of Dr. Fuchs, a medical expert whose findings the ALJ afforded "great weight." (Tr. 28.) Certainly, an ALJ may rely on the findings of medical experts and consultative examiners. *See Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) ("[The Regulations] permit the opinions of nonexamining sources to override treating sources' opinions, provided they are supported by evidence in the record."). However, in doing so, an ALJ may not run afoul of the "treating physician rule."

Under the "treating physician rule," an ALJ must consider each and every medical opinion in a claimant's administrative record. *See* § 404.1527(c). Importantly, an ALJ must generally give the medical opinion of a treating physician, "controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 78–79 (2d Cir. 1999) (citing *Clark*, 143 F.3d at 118); *accord Shaw*, 221 F.3d at 134. The reason for preferring the findings of a treating physician is plain: the treating physician is in a more capable position to provide a detailed picture of the claimant's

15

impairments than a consultative physician who has seen the claimant in just one individual examination. *See* 20 C.F.R. § 404.1527(c)(2); *Estela-Rivera v. Colvin*, No. 13-CV-5060, 2015 WL 5008250, at *13 (E.D.N.Y. Aug. 20, 2015) (explaining preference for treating source opinions). Where the ALJ determines that controlling weight should not be given to the treating physician, the ALJ must set out good reasons for his failure to do so. *See Schisler*, 3 F.3d at 568 ("[T]he regulations, like our rule, require the Secretary to provide a claimant reasons when rejecting a treating source's opinion."); *see also* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion.").

Here, the ALJ accorded only "some weight" to the findings of Plaintiff's treating physician, Dr. Wright. (Tr. 28.) The ALJ explained that Dr. Wright's opinion was accorded this lesser weight because Dr. Wright did not submit a function-by-function assessment and Dr. Wright's opinions were inconsistent with the record. (*Id.*)

As an initial matter, the ALJ's finding that Dr. Wright did not submit a function-by-function assessment is insufficient to justify discounting Dr. Wright's opinion where it was the ALJ's duty to develop the record. That is, where there are gaps in the administrative record or inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out additional information from the treating physician to supplement the record. *See Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir. 2009) ("[I]t is the rule in our circuit that the . . . ALJ . . . must . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding.") (quoting *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999)); *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) (observing that when an ALJ notes inconsistencies in a treating physician's reports, the ALJ has an affirmative duty to further

16

develop the record) (citing *Clark*, 143 F.3d at 118); *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir.1996)). There is no evidence that the ALJ made any effort to do so in this case. Instead, the ALJ simply reports that the "claimant's treating physician did not submit a function-by-function analysis . . . despite being provided the opportunity" to do so. (Tr. 27.) Because the ALJ failed to discharge his duty to develop the record, his finding that further information was required of the treating physician cannot provide a good reason to discount the treating physician's opinion. *See Estela-Rivera*, 2015 WL 5008250, at *14 ("The failure to provide 'good reasons' for not crediting a treating source's opinion is ground for remand.") (quoting *Burgin v. Astrue*, 348 F. App'x 646, 648 (2d Cir.2009)); *see also Johnson v. Astrue*, 811 F. Supp. 2d 618, 629 (E.D.N.Y. 2011) (explaining that if the treating source does not explain how a claimant's impairment impacts her work-related capabilities, the Act provides that the Commissioner will request such a statement) (citing *Perez*, 77 F.3d at 47); *Gabrielsen v. Colvin*, No. 12-CV-5694, 2015 WL 4597548, at *7 (S.D.N.Y. July 30, 2015) (collecting cases and finding that the ALJ failed to adequately develop the record where she found a treating psychiatrist's treatment notes inconsistent with a medical source statement, but did not contact the psychiatrist for clarification); *Gorman v. Astrue*, No. 08-CV-0251, 2009 WL 4884469, at *5 (N.D.N.Y. Dec. 10, 2009) (finding that the ALJ erred by not seeking additional information where he concluded that treating physician's opinions were "internally inconsistent and not supported by clinical findings").

Moreover, the ALJ failed to identify which of Dr. Wright's opinions is inconsistent with the record, such that the opinion merited only "some weight." (Tr. 28.) A review of the record shows that Dr. Wright's opinions are consistent with Plaintiff's other treating physicians in at least three regards. *First*, Drs. Wright and Seldes' tests both revealed that Plaintiff's right knee

remained an issue after her August 13, 2012 right knee arthroscopic surgery. (Tr. 349, 455.) *Second*, throughout 2013, Drs. Wright and Seldes both treated Plaintiff for injuries sustained when her buckling knees caused her to trip and fall. (Tr. 351, 443–44, 468.) *Third*, from 2011 to 2014, Drs. Wright, Seldes, and Brisson referenced Plaintiff's inability to work for various periods of time. (Tr. 334–35, 340, 346, 379, 478.) Indeed, on April 10, 2014, Dr. Seldes noted that "Patient is still unable to return to work." (Tr. 478.) Without any indication from the ALJ about the nature of any purported inconsistency, the Court cannot adequately assess the ALJ's application of the treating physician rule.

Furthermore, while the ALJ's opinion mentions the progress notes of treating physicians Drs. Brisson and Seldes, it does not address the weight given to either opinion with any modicum of specificity.[4] Presumably, the ALJ intended to include their opinions in his general catchall: "[a]ll other opinions have been considered and accorded some weight." (Tr. 28.) However, just as the ALJ explained that he afforded "limited" weight to Dr. Klein because his assessment reflected no limitations, which was inconsistent with the record, the ALJ should have provided reasoning as to why Drs. Brisson and Seldes' opinions were not given controlling weight under the treating physician rule.

The Court remands to provide the ALJ with an opportunity to request a function-by-function statement from Drs. Wright, Seldes, Brisson, and any other doctors who may have treated Plaintiff. *See Johnson*, 811 F. Supp. 2d at 630–31 (remanding with instruction for ALJ to request assessments from plaintiff's treating sources); *accord Robins v. Astrue*, No. 10-CV-3281,

---

[4] Progress notes can constitute an opinion. *See* 20 C.F.R. § 404.1527(a)(1) ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.").

18

2011 WL 2446371, at *3 (E.D.N.Y. June 15, 2011). If after reviewing the record, the ALJ does not accord Plaintiff's treating sources controlling weight, the ALJ must detail his reasons for not doing so, with sufficient specificity. *See* 20 C.F.R § 404.1527(c)(2) (stating that the Commissioner must "give good reasons in [his] notice of determination or decision for the weight [he] give[s] [the claimant's] treating source's medical opinion"); *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) ("Remand is particularly appropriate where, as here, we are unable to fathom the ALJ's rationale in relation to the evidence in the record without further findings or clearer explanation for the decision."); *accord Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) ("[T]he crucial factors in any determination must be set forth with sufficient specificity to enable [the court] to decide whether the determination is supported by substantial evidence.").

## CONCLUSION

For the aforementioned reasons, Defendant's motion for judgment on the pleadings is hereby denied. Pursuant to 42 U.S.C. § 405(g), the Commissioner's decision is remanded for further proceedings and additional findings consistent with this Order. The Clerk of Court is respectfully requested to enter judgment and close this case.

Dated: Brooklyn, New York
      March 23, 2018                                     SO ORDERED:

                                                                   /s/LDH
                                                    LaSHANN DeARCY HALL
                                                  United States District Judge